Louis W. HODGES et al., Plaintiffs,

v.

Ann KLEIN, Commissioner etc., et al., Defendants.

Civ. A. No. 75–2260.

United States District Court,
D. New Jersey.

April 30, 1976.

Louis W. Hodges, pro se.

Earnest Pace, pro se.

Leora Mosston, Prisoners' Rights Organized Defense, Newark, N. J., Charles H. Jones, Jr., Stephen Latimer, Prison Law Clinic, Rutgers University School of Law, Newark, N. J., for plaintiffs.

William F. Hyland, Atty. Gen. of New Jersey by Joseph T. Maloney, Richard H. Mills, Deputy Attys. Gen., Trenton, N. J., for defendants.

Jeffry Mintz, Dept. of the Public Advocate, Trenton, N. J., for amicus curiae.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CLARKSON S. FISHER, District Judge.

This matter comes before the Court on an order to show cause why anal examinations of certain inmates, defined in the class action certification made by this Court, should not be enjoined as violative of their constitutional rights. This is an emergent matter arising within the context of a broader civil rights action initiated by the inmates who occupy an area of the Trenton State Prison known as the Management Control Unit,[1] (hereinafter referred to as M.C.U.). As to the creation of this Unit, its operation and legality, more will be said in a subsequent opinion following the completion of current hearings. Suffice it to say that the M.C.U. is a maximum security area within a maximum security prison[2] in which certain inmates, determined to be disruptive or assaultive, are confined under twenty-four hour lock-up conditions.

The anal search aspect of this civil rights action initially involved the anal examinations performed on M.C.U. inmates, and this Court issued a temporary restraining order which enjoined such searches,[3] except in certain circumstances. During the hearings held on this matter, the entire subject of anal search procedures at Trenton State Prison was examined in some detail, and the Court is of the opinion that this aspect of the case must be dealt with as it applies to the entire prison.[4]

## FINDINGS OF FACT

From the testimony taken in this matter, it was determined that as part of the internal security procedures at Trenton State Prison a "strip search" of inmates is employed by prison guards under certain conditions. This requires the inmate to take off all of his clothes, which are then searched, and submit to a body search. The inmate raises his arms, opens his mouth for inspection and removes his dentures, if any. He must also spread his legs apart, lift his penis and scrotum to reveal the area directly between his legs. He must also bare the

---

1. The action was brought under 42 U.S.C. § 1983, and this Court has jurisdiction under 28 U.S.C. § 1343.

2. Trenton State Prison is the State's oldest penal institution, the newest portion of which was completed shortly after the turn of the century. The prison houses over 800 inmates, approximately 3/4 of whom are serving lengthy sentences for violent crimes such as murder, rape and armed robbery.

3. An anal search or examination, referred to in the Court's restraining order as a rectal search (the latter a general but somewhat inaccurate anatomical reference to the human anus), entails spreading one's buttocks to reveal the anal cavity. This occurs in the course of a strip search. See discussion, infra.

4. See reference to Fed.Rules Civ.Procedure 15(b), infra.

soles of his feet. The inmate must then bend over and spread his buttocks to reveal his anus to the guard. It is this latter portion of the strip search which is in issue here.

As to the circumstances under which the strip search with anal examination is required, the testimony indicates that it is performed whenever any inmate leaves or enters the institution, after a contact visit with his friends or relatives, and when entering or temporarily leaving disciplinary segregation/solitary confinement[5] or administrative segregation[6] for any reason (i. e. appearance at Adjustment or Classification Committee hearings, prison hospital, etc.). Such a search will also be performed on any occasion where there is "probable cause"[7] to believe that the inmate is concealing contraband or a weapon. It should be noted, however, that testimony from both the prison warden, defendant Hoffman, and the Director of Corrections and Parole, defendant Fauver, indicated that for some time the anal inspection portion of the strip search had not been a regular part of that search under all of the above circumstances. In any event, it is clear that the anal examination was reinstituted as a regular part of the strip search after a January 19, 1976 disturbance.

The M.C.U. inmates are subject to the same procedures as outlined above, and, since they are in a lock-up condition not unlike administrative segregation, they have been required to submit to a strip search with anal inspection whenever they leave and return to the Unit for any reason regardless of whether they were escorted or unescorted. Prior to the Court's restraining order, M.C.U. inmates had to submit to a strip search with anal examination before and after use of their segregated exercise yard. This was so despite the fact that these inmates were under continuous lock-up with little or no contract with any other inmates.

The testimony also revealed that the anal inspection aspect of the strip search was used in a manner which would result in disciplinary charges against the M.C.U. inmates. If an inmate refused to submit to the anal inspection portion of the search he forfeited his opportunity to leave the Unit for whatever reason. In addition, however, he was given a disciplinary charge for refusing a direct order to submit to an anal inspection. This ultimately resulted in the inmate doing time in the "hole"—solitary confinement.

For an M.C.U. inmate to be transferred from his lock-up cell in the Unit to a solitary confinement cell, there is relatively little movement required. Since the solitary cells are located in the same maximum security wing of the prison, the inmate is escorted off his tier and down a few flights of stairs which are adjacent to the entrance of each tier in the wing. When he reaches ground level, he is escorted to a solitary confinement cell located on the lowest tier in that wing. The testimony revealed that before an M.C.U. inmate was permitted to enter his solitary cell, he was strip searched, as he was a few tiers above, and was ordered to submit to an anal examination. If he refused to submit, a forcible anal examination was conducted by prison guards. The testimony further revealed that these anal search orders and the forcible anal searches performed by guards, were done because it was a "rule". One guard stated that he ordered a forcible anal search even though he had no reason to believe that the inmate was secreting contraband in his anal cavity. These unfortunate confrontations occurred both before and after the Court's

---

5. While in solitary confinement, the inmate may have a very limited number of personal effects with him. Aside from special pajamas and bedding, the inmate is usually permitted only a few toiletry items and a Bible.

6. In administrative segregation, an inmate is permitted to have a greater number of personal

effects in his cell, but remains under continuous lock-up with extremely limited contact with other segregated prisoners.

7. The Court uses the term "probable cause" here in its generic sense. The precise standard to be used when a guard desires to conduct an anal examination will be discussed infra.

restraining order, and resulted in additional disciplinary charges.

Finally, the testimony of various inmates indicates that they view the anal inspection portions of the strip search as degrading, dehumanizing and abusive. The testimony of prison officials indicates their concern for stopping the flow of contraband into and within the prison, such contraband including everything from messages to narcotics to bullets. It is significant to note that wide-spread occurrences of narcotics, bullets or similar contraband being secreted in the anus or rectal cavity were not indicated.

## CONCLUSIONS OF LAW

■ Federal courts are reluctant to interfere with the operation of state prisons, *Procunier v. Martinez*, 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224, 235 (1974), and will do so only when inmate claims are of constitutional dimensions. The law is already clear that, " . . . [t]here is no iron curtain drawn between the Constitution and prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974). Whether prisoners enjoy any Fourth and Fourteenth Amendment rights has never been decided by the United States Supreme Court, but has been considered by other courts. In *Bonner v. Coughlin*, 517 F.2d 1311 (7th Cir. 1975) an opinion by now Supreme Court Justice Stevens faced the question of " . . . whether the Fourth Amendment provides any protection at all to a person incarcerated as a result of conviction of a serious crime." *Id.*, at 1315. The court, considering the limited expectation of privacy a prisoner could claim and the need for surveillance and control in a prison society, concluded:

" . . . that the possible application of some measure of Fourth Amendment protection within a prison context may not be summarily rejected."

*Id.* Most significantly, the court, after noting that an inmate is not a mere slave, said:

"Respect for the dignity of the individual compels a comparable conclusion with respect to his interest in privacy. Unquestionably, entry into a controlled environment entails a dramatic loss of privacy. Moreover, the justifiable reasons for invading an inmate's privacy are both obvious and easily established. We are persuaded, however, that the surrender of privacy is not total and that some residuum meriting the protection of the Fourth Amendment survives the transfer into custody."

*Id.* at 1316. See also, *Ferguson v. Cardwell*, 392 F.Supp. 750, 752 (D.Ariz.1975) which, while acknowledging that prisoners must be monitored closely and approving the taking of blood samples to detect the presence of narcotics, noted that prisoners have some Fourth Amendment rights; *Sostre v. Preiser*, 519 F.2d 763, 764 (2d Cir. 1975); *United States v. Savage*, 482 F.2d 1371 (9th Cir. 1973), *cert. denied*, 415 U.S. 932, 94 S.Ct. 1446, 39 L.Ed.2d 491. This Court agrees with the view taken in *Bonner, supra,* and the other cases cited—prisoners are protected against *unreasonable* search and seizures and do have a qualified right to privacy.

■ In *Daughtery v. Harris*, 476 F.2d 292 (10th Cir. 1973), *cert. denied*, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973) the court had before it a Fourth Amendment challenge to a directive issued at the United States Penitentiary at Leavenworth, Kansas. This directive required that before an inmate is released to the custody of the United States Marshal for a court appearance or for any other reason, the inmate must submit to a "strip shake-down" with a rectal examination given by medical assistants. Considering the type of inmates, the many known instances of contraband being carried by inmates in the rectal cavity and

" . . . an increasing need to assure the safety of our law enforcement and court officials, this policy of allowing rectal searches must be considered reasonable unless contradicted by a showing of wanton conduct.

\* \* \* \* \* \*

. . . [T]he examinations were carried out by trained paraprofessional medical assistants in a designated area and under sanitary conditions. Also there was no attempt on the part of officials or medical personnel to humiliate or degrade the appellants."

*Id.* at 294, 295. The court:

" . . . did not deny the relevance of the Fourth Amendment; quite the contrary, it assumed that 'clear abuse or caprice' or 'a showing of wanton conduct' would override the institutional interest, and actually held only that on the facts before it 'the rectal searches in question were, and are, a necessary and reasonable concomitance of appellants' imprisonment.' " *Id.* at 295.

*Bonner, supra* at 1317. For this and other reasons, this Court is in complete agreement with the *Daughtery* court on the facts before it. In *Penn El v. Riddle*, 399 F.Supp. 1059 (E.D.Va.1975) a body-cavity [8] search was held to be not *per se* unreasonable under the Fourth Amendment and not unconstitutional under the facts before the court. In that case, contraband was found in the inmate's clothing and his work area immediately prior to the body-cavity search. While such circumstances clearly justify a strip search, it is not clear to this Court that these facts alone justified an anal inspection. In view of the fact that some of the contraband found was small enough to be hidden in the anal cavity, however, an anal inspection may have been reasonable in that situation. See also, *Giampetruzzi v. Malcolm*, 406 F.Supp. 836, 844 (S.D.N.Y.1975).

■ From these and other cases and the facts in the instant case, it is fair to say that:

"[a] Penitentiary is a unique institution fraught with sensitive security hazards, not the least of these being smuggling of contraband such as drugs, money, knives, etc. The state has a high security interest in eliminating smuggling into and out of penitentiaries.

\* \* \* \* \* \*

The inherent characteristics of a prison society, including guards, teachers, visitors and officials, are such that guards must make prompt decisions as search problems confront them. The governmental interest in preventing and detecting smuggling outweighs the individual interest in perfect justice."

*Gettleman v. Werner*, 377 F.Supp. 445, 451, 452 (W.D.Pa.1974). It can also be said that the institution has an interest in controlling the intra-prison flow of contraband as well as to protect the safety of prison guards and other inmates. The Court must now consider the extent to which these interests are furthered by anal (rectal) examinations and the extent to which the inmate's limited but nevertheless existent constitutional rights should be protected.

It must be said at the outset that this Court does not have the issue of the constitutionality of the strip search before it. The plaintiffs do not raise it, nor, it would seem, could they successfully do so in view of the large variety of weapons, narcotics and other illegal items which could be secreted in or under clothing. When and where strip searches (without an anal inspection) are required is within the discretion of prison officials. As was noted earlier, the only matter for the Court's consideration is the anal inspection aspect of the strip search.

■ The prison policy of requiring anal inspections when an inmate is entering or leaving the institution is clearly constitutional for many of the reasons suggested earlier. While submitting to such a visual inspection by prison guards is degrading and intrudes upon a prisoner's right of privacy, the state's interest under the above circumstances is so strong that it outweighs the individual interest. *Daughtery, supra.* Such a search under those circumstances is not unreasonable.

■ As for the prison policy of requiring anal inspections following personal contact visits between inmates and friends or relatives, the court reaches a similar

---

**8.** It is unclear which body-cavity was involved in this case.

conclusion.[9] When an inmate has a contact visit with a friend or relative, he is accorded complete privacy during the visit. As has been noted, the state's interest in preventing contraband from entering the prison is very strong and private contact with an individual from outside the institution presents an excellent opportunity for the introduction of all types of contraband into the prison community. The prison officials must be able to completely shut off this port of entry for contraband. To do so, an anal examination, degrading though it is, as part of the strip search, is not, in view of the state's compelling interest, an unreasonable requirement.

■ The institution's policy of requiring anal inspections when an inmate enters or temporarily leaves disciplinary segregation (solitary confinement), administrative segregation or the M.C.U., presents more serious problems. The state's interest in preventing contraband from entering the prison is obviously nonexistent under these circumstances. The only institutional interests in conducting anal searches in these circumstances would be to guard against intra-prison transfer of contraband and to protect the safety of prison guards. A more detailed examination of these interests follows.

To guard against the intra-prison transfer of contraband, particularly weapons, and to increase security, the prison utilizes metal detectors in the general population and in the segregated areas of the prison.[10] This cuts down on the transfer of weapons and other forms of contraband. In the areas of the prison where the segregation cells are located, there is a hand held metal detector which is and can be used on an inmate even during a strip search to determine whether he is secreting any metal in his anal cavity. Moreover, the anal cavity is small, making it virtually impossible to conceal an item of any size. In addition, it is difficult to see how an inmate in a segregated cell, under lock-up conditions and under escort or observation when out of that cell, could further the intra-prison transfer of contraband. Inmates in segregation have little or nothing in their cells, and what they do have is thoroughly searched before they are permitted to keep it. Under these conditions even contact among segregated prisoners in an exercise yard under surveillance of tower guards is unlikely to involve the transfer of contraband.

The testimony revealed a concern that inmates of the general prison population might pass contraband to prisoners in segregation when the latter are in unescorted contact with such inmates. This could apparently take place in two situations. First, it is said to be possible for inmates in a general population wing which borders the segregated exercise yard to throw items out of windows and into the yard. While such a situation may be possible, this Court has viewed this area and finds it difficult to envision an inmate in the yard with only ten other prisoners being able to hide an item in his anal cavity without being seen by the guards observing them. This also assumes that an inmate in the wing would throw narcotics, money or other non-metallic contraband into the segregated yard during an exercise period. It was further indicated in the testimony that guards can and do walk the yard both before and after a recreation period to check for the presence of contraband.

Secondly, it has been represented to this Court that segregated inmates receiving a

---

9. M.C.U. inmates are not permitted contact visits. It should also be noted that no anal examination is required after any inmate has a contact visit with his attorney. Such visits are usually observed from a distance by guards.

10. The Court viewed these metal detectors on its visit to the prison and found them outdated to say the least. Moreover, the testimony revealed that these devices are ineffective in detecting the presence of certain metals such as bronze. The Court views the State's inability to provide the prison with adequate security devices as inexcusable. This continued neglect not only increases the already large number of civil rights actions brought into federal court, but permits further deterioration of an already antiquated facility.

window visit, (i. e. inmates look through glass at the visitor and speak through a telephone) could come into unescorted contact with inmates of general population and contraband could be transferred. The Court has viewed the window visiting area and feels it must also consider: The unlikely event that particular visits could be properly timed and that particular inmates could then be seated next to each other to pass non-metallic contraband; the inability of the segregated inmate to then subtly and secretly conceal the contraband in his anal cavity while in view of the visitors and the prison guard who, while not in the room, is constantly and without notice entering to usher prisoners in or out; and the ability of prison officials to easily segregate inmates within the visiting room.

There is no doubt that the state has some interest in requiring anal examinations before an inmate enters segregation or has unescorted contact with general population inmates. There is also no doubt that the state has no interest in requiring anal examinations before or after a segregated inmate is moved within the segregation area or anywhere in the prison while under escort or observation. In all of the above situations a metal detector protects the safety of prison guards by detecting any metal in the anal cavity without forcing the inmate to spread his buttocks. To this extent the prisoner's constitutional right to privacy and the state's interest are both protected. To the extent that the state's interest in controlling intra-prison transfer of contraband justifies an anal examination before an inmate enters the segregation areas, after he returns from the segregated exercise yard or after he returns from a telephone visit, the court concludes that the residuum of Fourth Amendment protection through which a prisoner retains an interest in privacy prevents the imposition of this degrading and humiliating search under these circumstances. *Bonner, supra.*

This Court is well aware of the demanding and often dangerous position of prison guards in the institutional society:

" . . . [P]rison guards must have discretion to act quickly and decisively, and other reasonable procedures of everyday disciplinary problems should not be employed to handcuff prison guards . ."

*Gentleman, supra* at 451. In view of their difficult role and the special environment in which they work, pragmatic standards must guide their actions. This Court is of the opinion that some instructive parallels exist between the prison guard and the customs officer. Although the governmental interests are somewhat different, the standards regarding body-cavity searches by customs officers are controlled by similarly pragmatic considerations.

"Instead of the usual requirement of probable cause to believe that an individual possesses contraband or that he has committed a crime demanded by the Fourth Amendment, a customs officer need only have a reasonable suspicion of illegal activity."

*United States v. Beck,* 483 F.2d 203, 207 (3d Cir. 1973).

" 'Real suspicion' justifying the initiation of a strip search is subjective suspicion by objective, articulable facts . . . The objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; . . ."

*United States v. Guadalupe-Garza,* 421 F.2d 876, 879 (9th Cir. 1970); see also, *United States v. Diaz,* 503 F.2d 1025 (3d Cir. 1974).

"*A body cavity search, however, requires more. There must be a 'clear indication or plain suggestion' that contraband may be located in a body cavity."* (Emphasis added).

*United States v. Sosa,* 469 F.2d 271, 272 (9th Cir. 1972).

A consideration of the earlier portions of this opinion should allay any concerns that this Court intends to enunciate the foregoing standards for a strip search or anal search as the constitutional standards for all prisoner searches. As this opinion makes clear, in a prison environment there are circumstances where strip and anal cav-

ity searches are "a necessary and reasonable concomitance of . . . imprisonment." *Daughtery, supra* at 295. As noted earlier, the requiring of strip searches is in the discretion of prison officials. This Court does feel, however, that insofar as an anal search is concerned, the guards conducting a strip search, under circumstances other than those in which an anal search has been held permissible, cannot conduct a visual anal search of an inmate unless there is a reasonably clear indication or suggestion that the inmate is concealing something in his anal cavity.

 Under the Court's initial restraining order, the defendants were ordered to release all M.C.U. inmates who were held in solitary confinement for disobeying a direct order to submit to an anal search until resolution of the matter now before the Court. In addition, the Court restrained the defendants from disciplining any M.C.U. inmate for failing to submit to an anal search for the duration of the order. As to those M.C.U. inmates who were disciplined solely for refusing to obey a direct order to submit to an anal examination, the Court is of the opinion that, unless it is shown that their refusal involved entering or leaving the institution or a personal contact visit, these M.C.U. inmates were exercising their constitutional right of privacy and should not have been disciplined for refusing to submit to an anal examination.

As to those inmates who refused to submit to an anal examination and resisted the forcible inspection which ensued, a more difficult problem is presented. From the testimony of inmates and guards alike, it became abundantly clear to this Court that there was a great deal of misunderstanding and misinterpretation of the Court's temporary restraining order by both groups. In a few instances it appeared that the inmates had misconstrued the order in refusing to submit and in more numerous instances the guards had misconstrued the order in insisting upon an anal inspection. In both of these forcible situations, M.C.U. inmates were disciplined not for failing to obey a direct order to submit, as the Court's order

forbid same, but were disciplined for assault upon resisting a forcible rectal search. The Court regrets that these problems developed for it was seeking only to reduce the number of confrontations and encourage understanding—not the converse. The Court hopes that the order it now issues will not meet the same fate. In the interest of equity and justice, and so that tensions may be reduced within the Management Control Unit to enable both the inmates and the prison guards to operate anew, this Court will order that those M.C.U. inmates in solitary confinement for actions which involved resisting forcible anal examinations be released from same, unless it is shown that their refusal to submit involved entering or leaving the institution or a personal contact visit.

Finally, as was noted earlier, the question of anal searches arose in the course of a civil rights action by Management Control Unit inmates. During the course of the hearings on this issue, the entire subject of anal searches throughout Trenton State Prison was litigated by the parties. The Court does not wish to broaden this litigation any more than is necessary; however, in view of the testimony, the anal search aspect of this case must now be said to involve the entire prison. Rule 15(b) of the F.R.Civ.P. states:

> "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. * * *"

The Court will leave the parties to their own intentions regarding this aspect of the action, but does consider the issue of anal searches at Trenton State Prison to have been tried before it. The Court further concludes that a sufficient showing for preliminary injunctive relief has been made. *Oburn v. Shapp*, 521 F.2d 142 (3d Cir. 1975).