**Lawrence HUNT, Plaintiff,**

v.

**POLK COUNTY, IOWA, Defendant.**

Civ. No. 80–382–C.

United States District Court, S.D. Iowa, C.D.

Nov. 12, 1982.

Mark Bennett, Des Moines, Iowa, for plaintiff.

Dan L. Johnston, Polk County Atty., Thomas M. Werner, Asst. Polk County Atty., for defendant.

## RULING AND ORDER

STUART, Chief Judge.

The Court has before it the parties' cross-motions for summary judgment, filed July 1 and July 16, 1982, on the issue of whether plaintiff's constitutional rights were violated when employees of the Polk County Jail strip-searched him following his arrest on March 18, 1980. Although plaintiff's complaint originally included other claims, the parties filed a stipulation of dismissal of those claims on August 26, 1982. Thus, only the legality of the strip search and the damages, if any, that resulted from it remain as issues in this case.

## I.

Summary judgment is appropriate only when the pleadings, briefs, and documentary evidence on file demonstrate that no genuine issue of material fact remains in dispute and that the moving party is entitled to judgment as a matter of law. F.R. C.P. 56(c); *Vette Co. v. Aetna Casualty and Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). If the record so warrants, a grant of summary judgment fulfills the salutary purpose of avoiding useless and time-consuming trials. *Butler v. M.F.A. Insurance Co.*, 591 F.2d 448, 451 (8th Cir.1979).

In the present case, the parties have jointly stipulated all the facts that appear to be material to a determination of the constitutionality of plaintiff's strip search. The Court accordingly finds that there is no genuine issue of material fact which would bar summary judgment, and the Court may proceed to determine whether plaintiff or defendant is entitled to judgment as a matter of law.

## II.

The joint stipulation of facts filed by the parties on July 1, 1982, states in pertinent part:

1. On March 18, 1980, at approximately 7:54 p.m., the Plaintiff was driving his automobile in Polk County, Iowa, when he was stopped and charged with speeding. A routine check of his driving record at that time indicated an outstanding misdemeanor warrant for the Plaintiff's arrest. The Plaintiff was subsequently arrested, pat searched by the arresting officer, and transported to the Polk County Jail in Des Moines, Iowa.

2. Upon arrival at the Polk County Jail, the Plaintiff was advised that he could post a bond of $135 in cash. Plaintiff did not have sufficient cash at that time to post bond, and was allowed to make a telephone call to friends, who agreed to personally come down to the Polk County Jail and post Plaintiff's bond.

3. After the Plaintiff's telephone conversation with his friends, he advised certain employees of the Polk County Jail that friends of his would be down that night to post bond for him.

4. Prior to July 1, 1980, the policy of the Polk County Sheriff's Department and the Polk County Jail was to strip search all individuals arrested and brought to the Polk County Jail for processing if those individuals were to be incarcerated or temporarily detained in the housing cells. The strip search policy of the Polk County Jail as it existed at that time, and a memorandum directing jail employees to enforce the same, are attached hereto and incorporated herein as Exhibits A and B, respectively.

5. The strip search policy of the Polk County Jail was implemented to decrease and discourage the continual stream of contraband into the jail, and was deemed necessary for the security of the jail and the safety of jail employees and inmates. It is expressly stipulated that past strip searches of individuals processed at the Polk County Jail had resulted in the frequent confiscation of contraband.

6. That, after being processed at the jail, the Plaintiff was strip searched, since he was to be incarcerated pending his friends' arrival at the jail to post bond for him. The strip search included the removal of all of the Plaintiff's clothing, and required a visual inspection of the Plaintiff's body cavity.

7. The procedure followed by the Polk County Jail employees in conducting the strip search of the Plaintiff was in accordance with the attached policy of the Polk County Jail. It is expressly stipulated that:

a) The number of jail employees present at the strip search of the Plaintiff was not excessive or unreasonable;

b) the room where the strip search was conducted is a private room not visible to the jail staff or the public, and no one was present during the strip search save certain jail employees and the Plaintiff;

c) the strip search in question involved only a visual inspection of the

Plaintiff's body cavity, and no fingers were inserted in any of the Plaintiff's body cavities;

d) the strip search of the Plaintiff was not arbitrary, and the Plaintiff was neither physically nor verbally harassed during the conduct of the strip search in question.

8. The authorities in the Polk County Jail had previously determined that strip searches of the type in question herein could not be conducted in a less obtrusive fashion such as with a metal detector, since such a device would not have been able to discover contraband such as drugs or weapons fashioned from non-metallic materials.

9. The strip search policy at the Polk County Jail prior to July 1, 1980, and at the time of the strip search at issue herein, was not in derogation of any provision of the Iowa Code relating to the maintenance and administration of state prison facilities.

10. Regarding the strip search policy of the Polk County Jail, the following quotations from the deposition of Chief Jailer Floyd Jones, taken on January 8, 1981, are relevant:

'Q. What was your policy prior to July 1, 1980?

A. That all individuals arrested and booked who were going to be housed or incarcerated in the housing area of the jail would be strip searched.

Q. That would include individuals who were arrested for minor traffic violations that were unable to post bond?

A. Yes, sir, everybody that was arrested that would be booked and housed inside the jail facilities.

Q. How long had that been the policy, to your recollection?

A. It was that way when I came in January 3rd of 1977.'

(Deposition of Floyd Jones taken on January 8, 1981; pages 5–6.)

11. Approximately two hours after the strip search in question, the Plaintiff's friends arrived at the Polk County Jail and posted bond for him and the Plaintiff was released from confinement.

The written strip search policies referred to in the stipulation are set out in the margin below.[1] These policies were discon-

---

1.  TO: ALL PERSONNEL      SUBJECT: BOOKING AREA
    FROM: CHIEF JAILER

It has been the practice here to body or strip-search newly arrested persons (male). It's not something you like but from the amount of dope I see in the mornings, you will have to continue to do it if we are to maintain jail security and control. Also we need to check for injuries they may have, inform PA and make reports of injuries. We can't allow drugs or weapons past the east gate as we have to confine people together in one room, so we have to protect them and ourselves.
If you need to search internally call PA and we'll get a warrant. Until we get enough jail clothes, search and return theirs and if they're going to stay we'll change them the next day. If there's enough jail clothes use them. The special grand jury has expressed alarm at the amount of drugs coming in so keep it from coming in.
Be courteous and careful.

TO: ALL JAIL DIVISION      DATE: FEBRUARY 4th, 1980
    ARRESTING OFFICERS
FROM: FLOYD JONES, CHIEF JAILOR

It shall be the policy of the jail division and of the officers of the Polk County Sheriff's department and any other arresting officer that brings in a prisoner charged with operating a motor vehicle while under the influence, that that prisoner shall be searched in the booking cage very carefully and thoroughly, and if there is any remaining doubt about concealed weapons and or contraband, the prisoner shall be strip searched prior to being taken to the ASAP room for processing. All of the above shall be done prior to being processed for the OMVUI charge. This policy shall be in force to maintain security, control and safety for the prisoner, the arresting officers and the jail staff.

tinued on July 1, 1980, when a new Iowa law took effect which prohibits strip searches of persons arrested for scheduled violations or simple misdemeanors unless there is probable cause to believe the person is concealing a weapon or contraband. *See* Iowa Code § 804.30 (1981); Iowa Acts, 68th G.A., Ch. 1188, § 2 (1980) (bill approved May 23, 1980).

## III.

It should be noted at the outset that plaintiff does not challenge the legality of all strip searches conducted by county jail officials. Rather, his constitutional challenge is limited to "the practice of strip and visual body cavity search of *temporary pre-arraignment* detainees charged with *minor* offenses." Plaintiff's brief at 3 (emphasis added). Moreover, plaintiff does not question the propriety of strip-searching such temporary detainees if there is at least a reasonable suspicion, based on articulable facts, that an individual detainee is concealing contraband or a weapon. *See Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982). Finally, there is no challenge to the manner in which the strip search of plaintiff was conducted.

Defendant concedes that pretrial detainees retain some Fourth Amendment rights upon commitment to a corrections facility, but argues that the challenged strip search policy was reasonable, even as applied to persons in plaintiff's position, and therefore did not violate the Fourth Amendment. The test of reasonableness under that amendment, as noted in *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979),

is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which

it is conducted, the justification for initiating it, and the place in which it is conducted.

As stated earlier, there is no challenge here to the manner or place in which the strip search of plaintiff was conducted. However, "a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience" which involves an "extensive intrusion on personal privacy." *Hunter v. Auger, supra,* at 674. Therefore, the Court's task is to determine whether defendant's need for strip-searching all persons in plaintiff's position outweighed the invasion of personal rights that such a search entails.

As stated in the factual stipulation, the Polk County Jail strip search policy was implemented to reduce a continual flow of contraband into the jail which had created security risks and other institutional problems. Drugs were apparently a major concern. The seriousness of the problems associated with the entry of contraband into correctional facilities has been recognized in numerous cases and is not questioned by the Court or by plaintiff. What plaintiff does question is whether he and similarly situated persons posed a sufficient threat of introducing contraband into the jail to justify a policy that required all such persons to be subjected to a strip and body cavity search even when there was no reasonable basis for individual suspicion of concealment.

In support of its strip-search policy, defendant relies primarily on *Bell v. Wolfish, supra,* which upheld a rule requiring all inmates at federal corrections facilities to expose their body cavities for visual inspection as part of a strip search after every contact visit with a person from outside the institution. The Supreme Court (with four justices dissenting on this issue) determined that the likelihood of smuggling following contact with outsiders, coupled with the strong institutional interest in preventing the entry of contraband, was sufficient to outweigh the considerable invasion of per-

sonal privacy inherent in such a search. Therefore, the Supreme Court held that it was constitutionally permissible to conduct such searches on less than probable cause. *Id.* 441 U.S. at 560, 99 S.Ct. at 1885.

Most other cases which have upheld across-the-board strip search policies have similarly involved already-incarcerated persons who are routinely searched before or after some contact with the outside world. *See Daughtery v. Harris,* 476 F.2d 292 (10th Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973) (strip search of federal penitentiary inmate prior to court appearance, to locate contraband which could threaten security of the transferring marshals or the court); *Bell v. Manson,* 427 F.Supp. 450 (D.Conn.1976) (strip search of pretrial detainees on return from court appearances and other outside visits); *Hodges v. Klein,* 412 F.Supp. 896 (D.N.J.1976) (strip searches of maximum security convicted prisoners when entering or leaving the institution and after contact visits with outsiders); *Giampetruzzi v. Malcolm,* 406 F.Supp. 836 (S.D.N.Y.1975) (strip search of "security risk" pretrial detainees after contact visits with outsiders). In addition, a policy requiring a strip search whenever a prisoner is transferred from one cellblock to another, for the purpose of preventing intra-institutional transfer of contraband, has been upheld. *See Spears v. Sheriff's Department Jailer,* Civil No. 80–377–E (S.D. Iowa, Order of June 30, 1981).

On the other hand, across-the-board strip-search policies have been held unconstitutional when applied to persons in plaintiff's position. In *Logan v. Shealy,* 660 F.2d 1007 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982),[2] the plaintiff was arrested for driving while intoxicated and was required to be detained in the county jail for four hours or until a responsible person arrived to take her home. The county sheriff had established a policy that all persons to be held at the detention center would be strip-searched for contraband and weapons, regardless of their offense or the anticipated length of their detention. The court held that, in the absence of cause in her specific case to believe she might possess such contraband, a strip search of the plaintiff pursuant to the county's blanket policy was a violation of her Fourth Amendment rights. Similarly, in *Tinetti v. Wittke,* 479 F.Supp. 486 (E.D.Wis. 1979), *aff'd,* 620 F.2d 160 (7th Cir.1980), the plaintiff was arrested for speeding and, being unable to post the required $40 cash bond, was taken to the county jail. There, she was strip-searched pursuant to a written county policy requiring such searches of all persons to be detained in the jail, regardless of their offense. The strip search was held unconstitutional. To the same effect is *Sala v. County of Suffolk* (E.D. N.Y., Order of November 28, 1978)[3] (unpublished decision; discussed in *Tinetti, supra,* at 491), in which one plaintiff was detained for failure to pay a $15 speeding fine and the other for failure to respond to a summons which had been sent to the wrong address. Both were strip-searched pursuant to an across-the-board county policy, and their searches were held to be unconstitutional.

The Court believes that the difference in results in the two sets of cases just discussed is based largely on a difference in the degree of likelihood that the persons to

---

**2.** The *Logan* decision was criticized by Justice Rehnquist, author of the majority opinion in *Bell v. Wolfish, supra,* in an in-chambers opinion he wrote in his role as Circuit Justice granting a temporary stay of *Logan* until the matter could be considered by the full Supreme Court. *See Clements v. Logan,* 454 U.S. 1304, 102 S.Ct. 284, 70 L.Ed.2d 461 (1981). As noted above, however, the full court denied certiorari in that case several months later. Thus, this Court has no indication of what the Supreme Court's view of *Logan* would be. It cannot, of course, be presumed that Mr. Justice Rehnquist's in-chambers opinion represented the views of anyone but himself.

**3.** This case was affirmed on other grounds at 604 F.2d 207 (2d Cir.1979). No opinion was expressed by the Second Circuit concerning the constitutionality of the search.

be searched would be concealing contraband. Unlike already-incarcerated prisoners returning from court appearances or contact visits with outsiders, there is little reason to suspect that newly-arrested traffic violators are concealing contraband or weapons, particularly when they are incarcerated solely due to their inability to post cash bail. *Tinetti, supra,* at 491.

Another rationale for upholding strip searches in the first set of cases is that prisoners' awareness of the across-the-board policy will deter them from attempting to smuggle contraband when their next opportunity arises. *See, e.g., Bell v. Wolfish, supra,* 441 U.S. at 559, 99 S.Ct. at 1884; *Bell v. Manson, supra,* at 452. The deterrence rationale, however, has little applicability to a person unexpectedly arrested on the street for a traffic violation. The existence of a strip search policy at the jail would be unlikely to either decrease or increase the probability that such a motorist would have contraband concealed on his body at the time of the arrest.

The balancing of interests under the Fourth Amendment reasonableness standard "usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (footnotes omitted). In some situations, however, the balance of interests precludes insistence upon any quantum of individualized suspicion. *Id.* at 654–55, 99 S.Ct. at 1396–97; *United States v. Martinez-Fuerte,* 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). Cases in which routine strip searches have been upheld appear to fall into the latter category because of the high degree of likelihood that contraband is being smuggled by the class of persons to be searched and because of the lack of less intrusive means of preventing the influx or intra-prison transfer of contraband.

Illustrative of the fact that the likelihood of concealing contraband in a particular situation affects the determination of whether individualized suspicion is required is the decision in *Hodges, supra.* In that case, as noted earlier, the court upheld across-the-board anal strip searches in situations involving contact with the outside world, where the opportunity for and likelihood of obtaining and concealing contraband was high. However, the *Hodges* court also struck down a rule requiring such searches of all inmates returning to segregation from the segregated exercise yard or from non-contact window visits with outsiders. Because of the low likelihood of transferring contraband in such situations, the court held that these anal strip searches could not be conducted unless there was "a reasonably clear indication or suggestion that the inmate is concealing something in his anal cavity." *Id.* 412 F.Supp. at 903.

The Court is of the opinion that the likelihood of a newly-arrested traffic violator or similar minor violator concealing contraband on his body is not great enough to justify an across-the-board strip and body cavity search of all such persons, especially when they are only to be detained temporarily until cash bond can be posted. Even though there may be an occasional danger that a person would purposely get arrested on a traffic charge in order to smuggle contraband to someone already in the jail, a less intrusive means of dealing with this problem would be to place temporary detainees in a part of the jail where contact with longer-term inmates is impossible. Any concerns that temporary detainees might conceal weapons could be largely eliminated by frisking or by the use of a metal detector. Only where reasonable suspicion of concealment exists with regard to a particular temporary detainee does the Court believe jail officials should be allowed to conduct a strip search of that person.

The Court therefore holds that strip searches of temporary pre-arraignment detainees charged with minor offenses not normally associated with weapons or con-

traband are permissible under the Fourth Amendment only if there is a basis for reasonable suspicion that the particular detainee is concealing a weapon or contraband. *Cf. Hunter v. Auger, supra,* at 674. Under the reasonable suspicion standard, jail officials "must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience." *Ibid.* Inchoate, unspecified suspicions are not enough. *Ibid.* Moreover, the suspicion must be individualized, *i.e.,* specifically directed to the person who is targeted for the strip search. *Id.* at 675. Reasonable suspicion, however, need not rise to the level of probable cause, and the Court is of the opinion that the constitution does not require a full-fledged showing of probable cause for a strip search in the jail or prison context.

### IV.

Nowhere in defendant's answer, briefs or other pleadings does defendant assert that there was any basis for individualized suspicion of concealment in plaintiff's case. Rather, defendant's contention has been that its across-the-board policy, now prohibited by Iowa statutory law, was reasonable under the Fourth Amendment. Because the Court has held that the policy, as applied to persons like plaintiff, was not reasonable under the Fourth Amendment in the absence of a reasonable suspicion requirement, and because there was no basis for individualized suspicion of plaintiff,

IT IS HEREBY DECLARED that the strip search of plaintiff on March 18, 1980, pursuant to defendant's written policy violated plaintiff's Fourth Amendment rights.

IT IS FURTHERMORE ORDERED that plaintiff's motion for summary judgment on the issue of the constitutionality of plaintiff's strip search be and it hereby is granted, and defendant's motion for summary judgment on the same issue be and it hereby is denied.