John Clair FICHTNER, Appellant,

v.

IOWA STATE PENITENTIARY,
Appellee.

No. 2–62634.

Supreme Court of Iowa.

Nov. 14, 1979.

C. J. Krogmeier of Deitchler, Thomas, Saunders, Krogmeier & Humphrey, Fort Madison, for appellant.

Thomas J. Miller, Atty. Gen., and Stephen C. Robinson and Gary L. Hayward, Asst. Attys. Gen., for appellee.

UHLENHOPP, Justice.

In this appeal involving prison disciplinary proceedings we consider the due process principles enunciated in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See also Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Kelly v. Brewer*, 525 F.2d 394 (8th Cir. 1975). Since fundamental constitutional rights are involved, we review the case de novo in light of the totality of the circumstances. *State v. Cullison*, 227 N.W.2d 121, 126 (Iowa 1975).

Petitioner John Clair Fichtner was incarcerated at the Iowa Men's Reformatory and was ordered to be transferred with five other residents to the Iowa State Penitentiary. While leaving the reformatory in a van and also while en route to the penitentiary, with two reformatory officers, some of the six residents allegedly caused considerable commotion. At the penitentiary, Officer Rubel, one of the two accompanying officers, placed three of the residents including petitioner on report for misconduct in violation of reformatory rules. Apparently Rubel lodged this report with penitentiary officials. The report states:

Violation of Rule # : 1, 2, 4, 7, 28, 32

.  .  .  .  .

On July 13, 1978, while leaving the Institution for transfer to ISP these residents were verbally disrespectful to CSII Shafer & Voc. Inst. Dick Teble. They said on the way out that "Shafer sucks ____ and that Mr. Teble was a ____. During the trip down to Fort Madison

Resident Spurlin continually saying "Rubel you are a _____ and that your wife is a whore. Resident Fichtner said that I'd better watch it because he would be getting out one day and that he could get even. While driving through the various cities we go through to get to ISP these three residents continually were yelling and saying abusive things to women who were walking on the city streets. During the trip these three residents did some damage to the State vehicle. Resident Spurlin threw out two ashtrays and one rubber strap, while Resident Matthews was trying to tear the vinyl interior with a hook from the straps. Resident Fichtner threw out the other rubber strap. Throughout the larger portion of this trip, these residents were kicking at the windows and sides of the van and when told to stop refused. Resident Spurlin and Fichtner lead a cheer with Matthews that kept on saying that "Rubel means _____." They also kept on referring to my wife as a _____ whore and that they were _____ her out on the streets. Throughout this trip [last line of report not photocopied in record].

At the penitentiary an officer of that institution delivered to petitioner a notice of the report with a copy of the report attached.

The penitentiary has about 400 disciplinary cases per month to process and has only one investigating officer, Reuben Baker. Baker interviewed petitioner and prepared this statement of the interview:

Fichtner states the reports are all wrong. States that he never heard any disrespectful remarks called out to or about anyone as they were leaving. States there were not any ashtrays in the seat he was sitting in. States that it was impossible for Spurlin to have thrown anything out any window because of the manner he was chained and the position in which he was sitting. Fichtner says he could not get to a window to throw anything out because he was sitting in the middle of the front seat and was chained and shackled. States that it is a lie and

he never made any statement to the officer about getting out and getting even. States he had no reason to. States that the only time anyone got loud was when the officer hit a bump going about 55 miles per hour. States he almost hit a pickup truck after running a stop sign. States he don't ever recall the officer ever turning around and looking back. No remarks made about people on the streets were never loud enough for anyone to hear them.

Petitioner requested Baker to have the two officers and the other five residents (two of whom petitioner knew by name) testify at the hearing on the report. The decision as to the particular witnesses to be called, however, appears to be within the province of the committee which hears the case. Baker did interview Officer Rubel who placed the residents on report, and also the two residents petitioner specified by name. Baker's statement regarding the Rubel interview follows:

Officer Rubel states that the inmate was not provoked by his driving. States that the inmates yelled remarks at people along the way and was verbally disrespectful as stated in the report.

One of the two residents was David L. Overcash. We quote Baker's statement of this interview:

Overcash states that he was one of the first persons in the van, and that there was not any ash trays in it. He states that everyone got upset because of the way the driver was driving. At one time he ran a stop sign and was almost hit by a truck full of people. Later hit bump doing about 50 miles an hour. States that there was no loud yelling at people along the way.

The other resident interviewed was Jack E. Whitney. We set forth the statement of the interview:

Whitney states that he never saw any ash trays being thrown out of the van. He states that what commotion there was was caused by the way the driver was driving. He states that at one point the driver ran a stop sign and was almost hit

by a pickup truck and later ignored a drive slow sign and hit bump driving around 50 miles an hour. States that Matthews never said anything during the trip except when the driver hit the bump.

The report came on for hearing before a two-person committee of penitentiary officials. At the hearing petitioner received copies of the statements of Baker's interviews. The committee members were not aware at that time of the contents of the reformatory rules alleged to have been violated. They nevertheless proceeded with a hearing on the allegations of fact in the report. No one appeared before the committee besides petitioner. The committee had before it Rubel's report and Baker's statements of interviews. At some point, not in petitioner's presence, the committee talked with Rubel by telephone, who confirmed the contents of his report. At least one committee member heard statements of other residents involved in the alleged incident, probably in connection with their hearings, but those residents apparently did not implicate petitioner.

Numerous hearings must perforce be held and this hearing was very brief. The committee members asked petitioner but few questions; they had before them the statement of his interview and the other interview statements. Petitioner's prior request for appearance of witnesses was not complied with; whether Baker informed the committee of it is not known. Petitioner asked for a polygraph test, but no action was taken in that respect. He also asked what the reformatory rules in question stated, but the committee was unable to tell him.

Petitioner was excused and then was recalled in a few minutes and told the committee found him guilty. The written account of the hearing, prepared at its conclusion, states:

IOWA STATE PENITENTIARY

DISCIPLINARY AUTHORITY HEARING

A. Committee Membership: Kirby & Eschmann

Inmate Name: Fichtner, John   Number 330066

B. Incident Number: Rule Violations    Date of
   Major 78–7–266   1, 2, 4, 7, 28, 32   ' Report
                    (Anamosa)      7–14–78

C. Reasons for Decision: Fichtner stated the report is not true and that he did not say anything to the officer. He stated the only time he said anything was when they were approaching a bridge. He denies threatening the officer.

Found guilty based on the officer's report.

D. Decision: Guilty         Good Time    2 days

                            Solitary     5 days

   Disposition: 5 days Solitary and 30 days administrative segregation in CH #20

E. Appeal: Inmate did wish to appeal the disposition

Later the same day the committee telephoned the reformatory about the rules on which the report was based, and then caused the following paper to be delivered to the three residents involved:

TO:   Danny Spurlin # 204112
      Elmer Matthews # 203953
      John Fichtner # 330066

FROM: Disciplinary Committee

RE: Rule Violations

This is to advise that we called the Reformatory at Anamosa, Iowa this date and they gave us the following information with reference to rules violated 1–2–4–7–28–32

(1) Disobeying a direct order

(2) Being disrespectful

(4) Swearing and improper language

(7) Disfigure or damage property

(28) Violation of safety rules and procedures

(32) Being a party to any activity contrary to institution regulations.

In disciplinary committee on 7–26–78 you were foung [sic] guilty of the following Anamosa rules violated:

Sprulin [sic] # 204112 rules violated 2–4–7–28–32

Fichtner # 330066 rules violated 2–4–7–28–32

Mathews [sic] # 203953 rules violated 7–28–32

A disciplinary decision such as the committee made automatically brings about a

loss of good time and honor time in accordance with a schedule in the prison rules. *See also* § 246.39, The Code 1979.

Petitioner appealed unsuccessfully through administrative channels. He then sought and obtained a writ of habeas corpus from district court. After trial, the court annulled the writ. Petitioner appealed to this court.

Petitioner challenges the disciplinary decision on several due process grounds and on one other ground. He claims the decision violates the due process of law clause of the Fourteenth Amendment to the United States Constitution in these respects: A. The committee members could not conduct a fair hearing because they did not know the reformatory rules; B. Petitioner was not provided a written statement of the facts relied on; C. Petitioner was not allowed to cross-examine the witnesses or question the information against him; D. Petitioner was not allowed to call witnesses on his behalf; E. One committee member talked with other witnesses, depriving petitioner of confrontation and an opportunity to contradict them; F. Reformatory rules 2, 4, and 32 are too vague; G. The evidence of petitioner's guilt is too insubstantial; and H. The Committee's decision did not adequately state the evidence relied on and reasons for the punishment. Petitioner also claims as he did in trial in district court that the penitentiary disciplinary committee could not enforce reformatory rules. Since petitioner's latter claim disposes of the appeal, we consider it first.

**I.** *Prison proceedings on alleged reformatory offenses and rules.* Petitioner had been incarcerated at the reformatory and was ordered transferred to the prison. These institutions each has its own personnel and disciplinary rules. At the time of the incidents reported by Rubel, petitioner was in the process of being taken from the reformatory or was en route from the reformatory to the prison. He had not reached the prison or been accepted there. He was in custody of two reformatory officers.

Rubel regarded petitioner's offenses as violations of reformatory rules; he reported violations of reformatory rules 1, 2, 4, 7, 28, and 32. The prison disciplinary committee also regarded the offenses as violations of reformatory rules; its written account of the hearing states:

Rules Violations

1, 2, 4, 7, 28, 32

(Anamosa)

The committee later ascertained what these reformatory rules were and summarized them in a document delivered to petitioner and the other two residents.

The disciplinary proceeding, however, was at the prison and was conducted under prison rules by prison officials, who imposed sanctions under prison rules. The record is barren of any statute or legal administrative order or rule which authorizes *prison* officials to conduct *prison* disciplinary proceedings and to impose *prison* sanctions for offenses committed (1) by residents who are in custody of *reformatory* officers (2) in violation of *reformatory* rules.

When Rubel placed the three residents on report he was right in basing the charges on violations of rules of the reformatory rather than of the prison. The residents were still in custody of reformatory personnel, and they had not yet reached or been received by the prison. Indeed the first alleged offense occurred at the reformatory itself. This meant, however, that the reformatory had to process the report for violation of its rules, absent some statute or legal rule or order authorizing the prison to enforce the reformatory's rules—none of which appears here.

The parties discuss section 246.8, The Code. The pertinent first sentence of that section, in the chapter relating to the prison and the reformatory, provides: "Disobedience by the convicts of the disciplinary rules of *the institution* shall be punished by the infliction of such penalties as are provided by law and the rules which are prescribed for the government of *said institution*." (Emphasis added.) The prison cannot contend successfully that this statute consti-

tutes authority for one institution to punish for offenses against the other institution or for violations of the other institution's rules.

A governmental agency such as a prison may not lawfully act beyond the scope of its authority. As stated in 1 Am.Jur.2d *Administrative Law* § 183, at 986 (1962):

> The determinative or adjudicating powers of an administrative agency, like all of its powers, are measured by the terms and necessary implication of the constitutional or statutory grant. An administrative agency is a tribunal of limited jurisdiction and may act only within the jurisdiction conferred upon it and may make only such orders as are authorized by the act creating or empowering it. Moreover, there may be things which are outside the scope of an admitted power of determination.

> . . . . .

> Administrative determinations must have a basis in law and must be within the granted authority. . . .

See also 73 C.J.S. *Public Administrative Bodies & Procedure* § 57, at 381–82 (1951).

On this record, the proceeding was beyond the authority of the prison. The authorities may, however, conduct another hearing based on petitioner's alleged misconduct, and if they do so they will have administrative flexibility in the process. *Wolff*, 418 U.S. at 567, 94 S.Ct. at 2980, 41 L.Ed.2d at 957 ("play in the joints"). While the reformatory's substantive and procedural rules and mode of punishment must be employed, nothing will prevent the hearing from actually being held at either the reformatory or the prison. Similarly, reformatory hearing officers may be used, or the reformatory warden may designate prison officers to conduct the hearing for the reformatory. If the hearing officers find the charges established, punishment under the reformatory's rules may be carried out at either institution. This flexibility will at once simplify the proceeding and comport with legal requirements.

II. *Due process.* We first consider due process requirements under *Wolff v.*

*McDonnell* and then the application of those requirements to this case to the extent the issues will likely arise in further proceedings.

■ A. *Wolff v. McDonnell.* The present case illustrates the balancing problem pointed out in *Wolff*, 418 U.S. at 556, 94 S.Ct. at 2975, 41 L.Ed.2d at 951: "In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." On the one hand, a penal institution naturally has numerous disciplinary problems; its population contains many people who have such problems. This means numerous investigations and hearings are necessary each workday. Unless the time of the institution is to be largely given over to investigations and hearings and the other activities of the institution are largely abandoned, the processing of disciplinary cases must be considerably simpler and more expeditious than trials of cases in the courts. As the Court stated in *Wolff, id.* at 556, 94 S.Ct. at 2975, 41 L.Ed.2d at 951, "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Some of petitioner's claims seem to equate prison disciplinary proceedings to criminal trials.

On the other hand, occupants of penal institutions, although prisoners, are persons, and they are not beyond the pale of the Constitution. Prison officials must not permit a disciplinary proceeding against such a person to be a mere gesture or a sham. The person has a liberty interest protected by the due process clause. In *Wolff* the Court adapted the due process guarantee to the setting of the prisoner, determining which traditional legal procedures are essential to due process in that setting, and which are not.

The Court first held that authorities must give the prisoner (1) advance written notice of the alleged violation and (2) a written statement in the findings of the evidence relied on and the reasons for the discipline

inflicted. The Court stated, *id.* at 564–65, 94 S.Ct. at 2978–79, 41 L.Ed.2d at 955–56:

These [two required procedures] are advance written notice of the claimed violation and a written statement of the fact-findings as to the evidence relied upon and the reasons for the disciplinary action taken. . . .

Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are in fact. . . . We hold that written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense. At least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the [disciplinary committee].

We also hold that there must be a "written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action. *Morrissey* [*v. Brewer*], 408 U.S. 471, at 489 [92 S.Ct. 2593, at 2604, 33 L.Ed.2d 484, at 499 (1972)]. . . . Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary action itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others. It may be that there will be occasions when personal or institutional safety are so implicated that the statement may properly exclude certain items of evidence, but in that event the statement should indicate the fact of the omission. Otherwise, we perceive no conceivable rehabilitative objective or prospect of prison disruption that can flow from the re-quirement of these statements. [Citations omitted.]

The Court also held that the prisoner has a right, although not unlimited, to call witnesses and to present written evidence. The Court stated, 418 U.S. at 566–67, 94 S.Ct. at 2979–80, 41 L.Ed.2d at 956–57:

We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing: but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional programs of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases. Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case. The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the

spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments. There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents.

Although the Court did not specifically enunciate the requirement of an impartial decision maker, that requirement is implicit in the Court's consideration of the makeup of the Adjustment Committee in the Nebraska prison in question, in its conclusion that the Adjustment Committee did not present "such a hazard of arbitrary decisionmaking that it should be held violative of due process of law," 418 U.S. at 571, 94 S.Ct. at 2982, 41 L.Ed.2d at 959–60, and in its consideration throughout the opinion of the *Morrissey* requirements. An impartial tribunal is of course a fundamental of due process in adjudicatory proceedings. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786, 93 S.Ct. 1756, 1761–62, 36 L.Ed.2d 656, 664 (1973).

The Court held however that three procedures usually associated with due process in the outside world are not normally required in the setting of the prison disciplinary proceeding: confrontation, cross-examination, and counsel. Following consideration of the prisoner's right to present evidence the Court stated, 418 U.S. at 567–68, 94 S.Ct. at 2980–81, 41 L.Ed.2d at 957–58:

Confrontation and cross-examination present greater hazards to institutional interests. If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability. . . . We think that the Constitution should not be read to impose that procedure at the present time and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination.

Perhaps as the problems of penal institutions change and correctional goals are reshaped, the balance of interest involved will require otherwise. But in the current environment, where prison disruption remains a serious concern to administrators, we cannot ignore the desire and effort of many States, including Nebraska, and the Federal Government to avoid situations that may trigger deep emotions and that may scuttle the disciplinary process as a rehabilitation vehicle. To some extent, the American adversary trial presumes contestants who are able to cope with the pressures and aftermath of the battle, and such may not generally be the case of those in the prisons of this country. At least, the Constitution, as we interpret it today, does not require the contrary assumption. Within the limits set forth in this opinion we are content for now to leave the continuing development of measures to review adverse actions affecting inmates to the sound discretion of corrections officials administering the scope of such inquiries.

With respect to counsel the Court stated, *id.* at 570, 94 S.Ct. at 2981–82, 41 L.Ed.2d at 959:

The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings.

Where an illiterate inmate is involved, however, or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if

that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff.

B. Application of *Wolff* requirements here. We eliminate the issues which are not likely to arise on a hearing, and take up the others.

■ 1. Petitioner claims that Rubel's report was insufficient as a charge. The report is detailed and adequate. *See Fitzgerald v. Procunier*, 393 F.Supp. 335, 339 (N.D. Cal.1975); *Williams v. Cannon*, 370 F.Supp. 1243, 1248 (N.D.Ill.1974); *Banks v. Norton*, 346 F.Supp. 917, 919 (D.Conn.1972); *Lathrop v. Brewer*, 340 F.Supp. 873, 881 (S.D. Iowa 1972).

■ 2. Petitioner's claim that he was improperly denied cross-examination asks for more than *Wolff* gives him. He may question the evidence against him to the extent that he may personally respond to the contents of the report and produce evidence in support of his position. *Wolff* does not, however, give him a right to be confronted by opposing witnesses. *Wolff*, 418 U.S. at 567–68, 94 S.Ct. at 2980, 41 L.Ed.2d at 957. *See also Baxter v. Palmigiano*, 425 U.S. 308, 323, 96 S.Ct. 1551, 1560, 47 L.Ed.2d 810, 823–24 (1976).

■ 3. If petitioner asks to present written material he must be allowed to do so. If he asks to call witnesses, they must be called unless the officers conducting the proceeding refuse because to do so would be unduly hazardous to institutional safety or correctional goals, or for "irrelevance, lack of necessity, or the hazards presented . . . ." *Wolff*, 418 U.S. at 566, 94 S.Ct. at 2979–80, 41 L.Ed.2d at 956–57. If the officers refuse to call witnesses, they would be well advised to indicate their reason in their decision; otherwise they run increased risk that their refusal may appear unjustifiable under the particular circumstances. *Compare Walker v. Hughes*, 558 F.2d 1247, 1259 (6th Cir. 1977), *with Hayes v. Walker*, 555 F.2d 625, 630 (7th Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977). If petitioner desires witnesses from an insti-

tution or place other than the one where the hearing is held, the officers may require that such witnesses' written statements, or written reports of interviews of them, be substituted for personal appearances. We do not imply that a hearing *by* the reformatory must be held *at* the reformatory.

■ 4. If the hearing officer or panel which is convened is otherwise impartial, *Meyers v. Alldredge*, 492 F.2d 296, 306 (3rd Cir. 1974), petitioner may not validly object because the panel hears witnesses, or considers written statements of witnesses, who do not confront petitioner. *Baxter*, 425 U.S. at 322–23, 96 S.Ct. at 1560, 47 L.Ed.2d at 824 n. 5; *Walker*, 558 F.2d at 1260.

■ 5. We do not have the text of reformatory rules 2, 4, and 32 and therefore cannot pass upon petitioner's vagueness issue. We point out, however, that disciplinary rules of penal institutions do not define crimes, and the full criminal-law strictures on vagueness are inapplicable. Since sanctions are involved, however, disciplinary rules must be intelligible. Applicable here, we think, is much of the rationale of *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). *See also Tate v. Kassulke*, 409 F.Supp. 651, 659 (W.D.Ky. 1976); *Landman v. Royster*, 333 F.Supp. 621, 656 (E.D.Va.1971); Annot., 40 L.Ed.2d 823. We leave this issue open.

■ 6. Rubel's report together with his telephonic confirmation of its contents constituted evidence of the alleged violations. *See Jackson v. McLemore*, 523 F.2d 838, 839 (8th Cir. 1975); *Willis v. Ciccone*, 506 F.2d 1011, 1018 (8th Cir. 1974). We emphasize that this does not mean a hearing officer or panel must believe that evidence if it is presented in a new hearing; nor do we intimate it should be disbelieved. The officer or panel must consider all the evidence presented and impartially find where the truth lies. We cannot of course determine at this time whether evidence has been presented which supports a decision in a new disciplinary proceeding, as we do not know what the record or decision will be in that proceeding.

7. The committee's decision was too terse. An elaborate opinion is unnecessary, yet the committee had to state, at least briefly, the evidence relied on and the reasons for the discipline inflicted. In a similar situation the court stated in *Hayes v. Walker*, 555 F.2d 625, 633 (7th Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977):

> Rather than pointing out the essential facts upon which inferences were based, the Committee merely incorporated the violation report and the special investigator's report. This general finding does not ensure that prison officials will act fairly. Nor will this finding protect against subsequent collateral effects based on misunderstanding of the initial decision.

*See also Finney v. Mabry*, 455 F.Supp. 756, 776 (E.D.Ark.1978); *Green v. Nelson*, 442 F.Supp. 1047, 1058 (D.Conn.1977); *Wagner v. Gilligan*, 425 F.Supp. 1320, 1324–25 (N.D. Ohio 1977).

Finally, we are not unaware of the question whether the Iowa Administrative Procedure Act applies to prison disciplinary proceedings. *Compare Clardy v. Levi*, 545 F.2d 1241, 1246 (9th Cir. 1976), *with Florida Department of Offender Rehabilitation v. Jerry*, 353 So.2d 1230, 1231 n. 4 (Fla.Dist.Ct. App.1978), and *Lawrence v. Michigan Department of Corrections*, 88 Mich.App. 167, 172, 276 N.W.2d 554, 557 (1979). *See also* Bonfield, *The Definition of Formal Agency Adjudication Under the Iowa Administrative Procedure Act*, 63 Iowa L.Rev. 285, 358 (1977). The parties have not argued this question and we do not address it.

We thus overturn the judgment of the district court and vacate the decision of the disciplinary committee, without prejudice to further proceedings based on petitioner's alleged misconduct.

REVERSED.