Victor BONO et al, Plaintiffs,

v.

William E. SAXBE et al, Defendants.

Civ.No. 74–81–E.

United States District Court,
S. D. Illinois.

Dec. 24, 1980.

James R. Burgess, Jr., U. S. Atty., S. D. Ill., E. St. Louis, Ill., for defendants.

New Hampshire Legal Assistance, Concord, N. H., Howard Eglit, American Civil Liberties Union, Dennis Cunningham and Michael Deutsch, Chicago, Ill., David Johnson, Land of Lincoln Legal Assistance, Marion Prisoners' Rights Project, Carbondale, Ill., for plaintiffs.

MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

This matter is before the Court on remand from the United States Court of Appeals for the Seventh Circuit in *Bono v. Saxbe*, 620 F.2d 609 (7th Cir. 1980). Proceedings in this Court prior to appeal are recorded at 450 F.Supp. 934 (E.D.Ill.1978) and 462 F.Supp. 146 (E.D.Ill.1978).[1] As the Court of Appeals stated in its order, "[w]e affirm with respect to most of the matters treated in the District Court's two opinions but remand for further proceedings involving *two* matters as set forth herein." 620 F.2d at 611 (emphasis added). Those two matters concern strip searches of Control Unit (or H-Unit) inmates before and after non-contact visits with family and friends, and the adequacy of lighting in the H-Unit cells. This Court was ordered to hear evidence and make a determination whether

---

1. The districts in Illinois were realligned on March 31, 1979, and this Court, designated to sit in East St. Louis, Alton and Benton, Illinois, became part of the Southern District of Illinois.

these two conditions imposed upon inmates in H-Unit are reasonably related to the need for institutional security at the United States Penitentiary, Marion, Illinois, and thus comport with the mandate of substantive due process. At the opening of the proceedings, plaintiffs' counsel urged upon this Court that the Court of Appeals' opinion was intended to open the issues on remand beyond the two specifically mentioned. Plaintiffs' Motion for Additional Relief on Remand is currently pending in this matter. The Court cannot accept plaintiffs' interpretation of the order of the Court of Appeals and hereby DENIES plaintiffs' motion. The opening language of the appellate opinion is clear that the scope of the remand is restricted to two matters. Thus, the Court will proceed to those two issues.

A. *Lighting in H–Unit Cells.*

At the hearing held in this matter on November 3 and 4, 1980, inside Marion Penitentiary, plaintiffs argued that this Court should categorically order that every cell in H-Unit be equipped with a 100 watt light bulb so that inmates may see better in their cells. Prison officials offered uncontradicted testimony that inmates complain often that the naked light bulbs of even lesser wattage in their cells are too bright. The Court actually visited in H-Unit and observed makeshift devices inmates had devised to diffuse and filter the bright light. It appears to the Court that the matter is better settled by the prison officials' offer to furnish either a 40, 60 or 100 watt light bulb upon request of an individual inmate. In this case, service of individual preference undercuts the constitutional dimension of the complaint. Thus, the prison officials should develop a reasonable procedure for giving to an inmate either a 40, 60 or 100 watt light bulb for his cell immediately.

B. *Visual Body (Strip) Searches.*

The Court of Appeals was particularly concerned with strip searches of inmates before and after non-contact visits with family and friends. The Court of Appeals did not believe that the rationale announced in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) justified the strip searches. Addressing this issue, the Court stated:

> The Supreme Court in *Wolfish* relied on the possibility of contraband being brought into the prison during *contact* visits to justify the use of strip searches. Those contact visits were not closely supervised by guards. *Wolfish* should not be extended to the facts of this case without a showing that there is some risk that contraband will be smuggled into Marion during non-contact supervised visits, or that some other risk within the prison will be presented.

*Bono,* 620 F.2d at 617. The Court of Appeals also expressed concern in a footnote that the evidence in the proceeding below indicated that strip searches are not required in connection with inmates' contact visits with their counsel, but are required when they visit family and friends. *Bono v. Saxbe,* 450 F.Supp. 934, 939 (E.D.Ill.1978) (Findings of Fact Nos. 40 and 41). With the issue before the Court so framed, and based on the hearings at Marion November 3 and 4, 1980, and the personal inspection of the visiting area and H-Unit by the Court at that time, the following findings of fact are made.

### FINDINGS OF FACT

1. An H-Unit inmate must submit to a visual body search, commonly referred to as a strip search, each time he leaves H-Unit for a visit.

2. An H-Unit inmate must submit to a strip search whether his visit is a non-contact visit with family or friends or a contact visit with an attorney.

3. Upon completion of either a non-contact or contact visit, each H-Unit inmate must submit to another strip search, which in most instances, is administered by correctional officers in an area adjacent to the visiting room area.

4. A strip search consists of an inmate removing all of his clothing, whereupon the correctional officer inspects the inmate's

body orifices for contraband. An inmate must lift his genitals and bend over to spread his buttocks for visual inspection. The inmate is not touched, except for an occasional situation where an inmate's hair style requires an officer to run his hands through the hair of the inmate to insure that no contraband is being secreted.

5. During non-contact visits, H-Unit inmates use "controlled visiting booths" in which the inmate is separated by a plexiglass partition from his visitor. The inmate and the visitor speak through a telephone.

6. The same "controlled visiting booths" are used by open population inmates, segregation inmates, and H-Unit inmates.

7. The ceiling of the controlled visiting booth in which the inmate is seated during non-contact visits is made of wire mesh which is not impenetrable and which could allow for limited contact with the adjoining booth.

8. There is no constant or direct supervision by correctional officers of inmates seated in the individual controlled visiting booths. The guard on duty cannot see into all the booths at once.

9. On at least one occasion, the plexiglass partition has been compromised by means of burning a hole in the partition.

10. Articles of contraband, including homemade weapons and homemade handcuff keys, have been found in the cells of inmates housed in H-Unit, as well as on the inmates of H-Unit themselves.

11. A cursory search of the controlled visiting booth is conducted by a correctional officer before an inmate enters to visit. Regular maintenance of these booths is performed during non-visiting hours by inmate orderlies.

12. Prisoners testified at the hearing as to taunting and baiting which occasionally accompanies the strip searches.

## CONCLUSIONS OF LAW

The Court has no doubt that visual body searches may invade personal privacy and may be a humiliating experience for the inmate, but these practices must be viewed in connection with the realities of prison life in general and Marion, in particular. The Court must decide whether the strip searches, both before and after non-contact visits, are reasonably related to the dictates of institutional security.

Plaintiffs contend that there is no need for a strip search before or after the non-contact visit in that the purpose of the strip searches, especially the second search, is to harass, humiliate and subjugate the inmates. Relying on the testimony of H-Unit inmates, plaintiffs argue that the "demeaning remarks, the sexually perverted taunting and baiting which frequently accompany the searches, together with the frequent harassment of the visitors, is only another aspect of the Control Unit regimen, and the anti-human philosophy which informs its operation." (Plaintiffs' Memorandum of Proposed Findings of Fact and Conclusions of Law at 3.) Defendants, on the other hand, while acknowledging that strip searches may invade personal privacy and be humiliating to the inmate, argue that the security needs of the United States Penitentiary at Marion outweigh the privacy of the inmates, and that the strip searches, before and after visitation, are rationally related to security needs. The Court agrees with defendants.

Although body searches may violate the Fourth Amendment, *Carroll v. United States*, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 60 L.Ed. 543 (1925), the Supreme Court in *Bell v. Wolfish*, 441 U.S. 521, 99 S.Ct. 1864 (1979), sanctioned visual body searches in contact visit situations when the practice meets the test of reasonableness. Other courts have condoned strip searches. *See, e.g., Daughtery v. Harris*, 476 F.2d 292 (10th Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); *Hodges v. Klein*, 412 F.Supp. 986 (D.N.J.1976). The test enunciated in *Bell* is clearly applicable to the present case. Although *Bell* dealt with contact visits and the instant matter concerns non-contact visits, the "reasonableness" test encompasses that difference and only requires a stronger showing of justification.

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular invasion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884.[2] Applying this test, the strip searches, before and after non-contact visits, emerge as constitutionally permissible.

■ The search itself is a visual search with no actual intrusion into the body cavities by correctional officers. An inmate is not touched except in special circumstances. The first search takes place after the inmate leaves his cell and the second takes place in a room adjacent to the visiting rooms. The first is designed to prevent inmates from entering the visiting area with contraband and the second is to insure that when the inmate returns to H-Unit, he is without contraband. Thus, the place and manner of the searches seem well calculated to achieve the desired end.

Probably the most crucial factor concerns justification. The Court is of the opinion that both searches are justified by the need to maintain security and prevent injury to guards and other inmates. It is clear that the first strip search is justified. First, both the former and the present Control Unit managers offered unrebutted testimony that the possession of contraband, including but not limited to homemade knives and homemade handcuff keys, must be prevented in order to protect both the staff and the inmates of H-Unit. Numerous items of contraband have been found in H-Unit cells and on the persons of the inmates housed there. Moreover, the types of inmates who testified were characteristic of H-Unit inmates against whom the tight security measure is aimed. One inmate witness had been found guilty by the Institution Disciplinary Committee of shooting at other inmates on two occasions. Another had been found guilty by the IDC of three separate escape attempts. This Court takes judicial notice of many criminal trials heard before it, in which H-Unit inmates were accused of acts of violence involving weapons. *See, e.g., United States v. Van Burkett*, Crim.No. 80–40026 (S.D.Ill. Aug. 22, 1980); *United States v. Greschner*, Crim.No. 80–40021 (S.D.Ill. May 29, 1980); *United States v. Garcia*, Crim.No. 77–05071–01–E (E.D.Ill. Dec. 14, 1977).

It is not unreasonable that prison officials believe that contraband may be used to compromise the security of the prison before a visit.

Greater attention should be focused on the second strip search which occurs after the non-contact visit. This Court actually stood inside one of the controlled visiting booths and observed the layout of the visiting room area, including the adjacent room where the second strip search is carried out. After this personal investigation and review of the testimony taken at the hearing, the Court is satisfied that the second strip search is reasonably related to the valid security goals of the prison. Testimony indicated that maintenance of the booths during nonvisiting hours is handled by inmate orderlies and that the same booths are used by inmates in open population, segregation and H-Unit. It is possible that inmate orderlies or prisoners from general population could secrete contraband in a hidden part of the booth or chair, which could be taken by an H-Unit inmate back to his cell after a non-contact visit. As testimony indicated, the prison guard supervising visitation cannot possibly observe all inmates in the booths at the same time, and the search

---

**2.** That the test of *Bell v. Wolfish* is applicable here is further buttressed by the Court of Appeals' statement that "*Wolfish* should not be extended to the facts of this case without a showing that there is some risk that contraband will be smuggled into Marion during non-contact, supervised visits, or that some other risk within the prison will be presented." 620 F.2d at 617. Thus, once the requisite showing has been made, the rationale of *Bell v. Wolfish* applies.

made by the correctional officer after a visit is necessarily short and non-thorough. Thus, there would be an opportunity for an inmate to so obtain contraband. In addition, it is possible that an H-Unit inmate could compromise the wire mesh ceiling of the controlled visiting booth and pass this contraband to another inmate. Indeed, when the Court inspected the booths, the wire mesh of one of the booths was loose enough to permit limited access to the other booth. Finally, the Court observed that in one situation the plexiglass partition in the booth had been compromised and a small hole burned in it.

■ While the result the Court has reached on the permissibility of the second strip search is by no means clearly warranted, it is clear that proper deference must be given to the informed discretion of the prison officials who are best qualified to make a determination whether certain conduct or conditions "possess the likelihood of disruption to prison order or stability, or otherwise interfere with legitimate penological objectives of the prison environment." *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 133, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1976). Certainly security is a paramount penological objective. The fact that prison officials cannot point to numerous instances where security has been compromised is not dispositive. A reasonable belief that a breach of security can occur is proof enough. *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). As was stated in *Bell v. Wolfish, supra,* the fact that few such instances occur "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." *Bell v. Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884–85. This Court is satisfied that the beliefs

of prison officials are reasonable, and that the strip searches are justified as valid security measures.

There was some testimony by prisoners that the strip searches are accompanied by taunting and harassment by the prison guards. The Court is not persuaded that the means to prevent this problem is by compromising the security of the institution. Rather, the Court expresses here its disapproval of such conduct and hereby conditions the use of strip searches upon the cessation and prevention of all such harassment by prison guards in the future.

Also, it was suggested by plaintiffs that the Court rule that where a strip search is reasonably necessary, the correctional officer should himself bend over to accomplish the body search, rather than require the inmate to do so. Although the Supreme Court in *Bell v. Wolfish, supra,* refused to impose a least restrictive alternative requirement on officials performing the searches, 441 U.S. 520, 559 n. 40, 99 S.Ct. at 1885 n. 40, the Court is satisfied that current procedures are in fact the least intrusive. The method suggested by plaintiffs could well lead to unnecessary friction between inmate and correctional officer, and could also increase the likelihood of physical contact during the search. One redeeming quality of the search is its visual, non-contact nature, which this Court is not willing to modify.

## CONCLUSIONS OF LAW

The foregoing discussion leads to the following conclusions of law:[3]

1. The first strip search, which takes place as inmates leave the Control Unit before non-contact visitation in controlled visiting booths, is reasonably related to the valid penological goal of the maintenance of security and thus complies with due process and the Fourth Amendment.

---

**3.** Although the Fourth Amendment was not urged on this Court by plaintiffs, nor mentioned by the Court of Appeals in its order, this was the limitation on government power dealt with by the Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Nevertheless, the "reasonableness"

test developed there to monitor Fourth Amendment compliance is for all practical purposes identical to that envisioned by the Court of Appeals in monitoring compliance with substantive due process. Thus, the searches comply with both the Fourth and the Fifth Amendments.

2. The second strip search, which takes place in an adjacent room as inmates leave the visiting area after non-contact visitation, is reasonably related to the valid penological goal of the maintenance of security and thus complies with due process and the Fourth Amendment.

IT IS SO ORDERED.