Jerry Lee WILLIAMS, Appellant,

v.

STATE of Iowa, Appellee.

No. 84–1750.

Supreme Court of Iowa.

Dec. 18, 1985.

Charles L. Harrington, Appellate Defender, and B. John Burns, Asst. Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Sp. Asst. Atty. Gen., and Sarah J. Coats, Asst. Atty. Gen., for appellee.

Considered by HARRIS, P.J., and McGIVERIN, LARSON, CARTER, and WOLLE, JJ.

LARSON, Justice.

In this postconviction relief case, the petitioner challenges a prison disciplinary proceeding resulting from his refusal to allow a body cavity search which, he claims, violated his rights under the fourth amendment. The district court denied relief, and we affirm.

Jerry Lee Williams was confined, in a single-occupancy cell, in the protective custody area at the Iowa State Penitentiary at Fort Madison. The "protective custody" area is not fully described in the record, but it appears it is a part of the prison complex where inmates are separated from the general prison population.

Two corrections officers went to Williams' cell and asked if he wanted to go to an exercise area. He said he did and began to undress for a strip search. He testified about the incident:

> [S]ince I had been locked down so long, I don't have to be told what to do. So I started putting my clothes in the bars and stripping down naked for them to go through the strip search procedures—standard strip search procedures. I was told to open my mouth, and at that time I was chewing some snuff, and they wanted to see what was inside my mouth. I said it is snuff in there. So they were satisfied with that. So they told me to raise my arms, and I raised my arms so they could look up my armpits or whatever, and I was told to turn around and raise my feet slowly, and then before I could comply with the turn around—before I could comply with the turn around, I was told: "Do you want to squat and cough now?" I was going to comply with the squat and cough, because I have had that squat and cough before coming to [cellhouse] 218 when I'm dealing with the CERT team, and before I could even complete the squat and cough, I was told: "Do you want to bend over and spread your cheeks?" That is the way it was said. Then I said: "I'm not no bitch."

Williams' response was considered to be a refusal to comply, resulting in prison disciplinary proceedings against him.

The printed strip search policy of the penitentiary stated its objective to be "[t]o retard passing of inmate contraband and lessen the possibility of an inmate to conceal a weapon upon his person." The search was required, under the policy, to be made by a member of the same sex, in an area "as private as is possible" without jeopardizing the safety of the searchers or impairing the effectiveness of the search. The search policy then set out the procedure to be followed:

3. The inmate will be instructed to remove all clothing and hand it to one of the searchers.

4. While remaining in visual contact with the subject, (to prevent discarding

any contraband) the clothing will be thoroughly searched and then set aside.

5. Subject will face the searcher(s), holding both hands in the air, palms ahead, and fingers spread apart. Slowly inspect the inmate from head to toe, looking for concealed items and needlemarks etc.

6. Have subject shake out his hair and turn his head to the side so that the ear canal can be inspected, then turn his head so that the process can be repeated.

7. Then have subject open his mouth, stick out his tongue, and roll upper and lower lips.

8. Have subject lift penis and scrotum to inspect the crotch area.

9. While keeping his hands in the air, have the subject turn around and lift one foot at a time so that the bottom of the foot, arch area, and the toes can be inspected.

10. Then have the subject [sic] put their hands on their buttocks, bend over, and spread the buttocks for a visual inspection of the anal area.

11. Squat and cough.

The squat and cough procedure is optional for the strip search. Keep in mind the reasons for this search and the destination of the inmate. It should always be used after a visit, for an inmate entering, returning, or leaving the institution, or when entering a maximum security cellhouse.

a. Keeping his hands in the air and both feet firmly on the ground and spread apart (shoulder width) have the inmate squat, so the buttocks are even with the knees.

b. While in this position, have the inmate cough several times while observing the anal area for any signs of concealment.

NOTE: The inmates [sic] is to be under close visual observation from start to finish during the strip search procedures.

The strip search procedure also provided for additional steps to be taken in the event evidence of contraband was found:

If it is determined or reasonably ascertained that the inmate has contraband concealed in a body cavity, he will be placed in a side room of the hospital or an equally secure area until he can be examined by a Physician or a Physician's Assistant. Criteria for this determination can include:

1. Visual observation during strip search.

2. Refusal of the inmate to cooperate with all or part of the search.

3. Investigative information.

■ At the outset, the State argues that the fourth amendment issue was not raised in district court. It points to Williams' postconviction petition which merely alleged that the search was "unconstitutional" under *Goff v. Nix,* No. 84–129–E (S.D. Iowa Dec. 21, 1984) (an unreported federal district court opinion filed after this incident and before Williams' postconviction hearing). The State argues that the order in *Goff,* enjoining certain body cavity searches, was filed after this event, thus it could not have been violated in Williams' case. Since no authorities other than *Goff* were cited by Williams in support of his constitutional argument, the State contends the constitutional argument must fail. The district court took this approach in denying postconviction relief.

We do not agree. Williams' reference to *Goff* in his petition, and later at his postconviction hearing, alerted the trial court and opposing counsel to the constitutional argument, because *Goff* was based on the fourth amendment. We believe these oblique references to the fourth amendment at least minimally raised the constitutional issue, and we therefore proceed to a discussion of it on the merits.

■ Postconviction relief actions are treated as special proceedings at law. *Kelly v. Nix,* 329 N.W.2d 287, 291 (Iowa 1983). When a fundamental constitutional question is raised, the court's review is de novo in light of the totality of the circumstances.

*Id.* *See also Thomas v. State,* 339 N.W.2d 166, 167 (Iowa 1983); *Snethen v. State,* 308 N.W.2d 11, 14 (Iowa 1981); *Fichtner v. Iowa State Penitentiary,* 285 N.W.2d 751, 752 (Iowa 1979). The petitioner has the burden of proof to show a constitutional violation by a preponderance of the evidence. *Stanford v. Iowa State Reformatory,* 279 N.W.2d 28, 31 (Iowa 1979). *See also Thomas,* 339 N.W.2d at 167; *Kelly,* 329 N.W.2d at 291.

■ Prisoners are not divested of their constitutional rights upon their confinement in a correctional institution. *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974) ("There is no iron curtain drawn between the constitution and prisoners of this country.").

Fourth amendment rights of prisoners, however, raise special problems. In these cases, the Supreme Court has adopted a balancing test, under which the security of the prison officers, inmates, and members of the general public are weighed against the constitutional rights of the prisoner:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, and in other cases.

*Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979) (citations omitted).

The restricted scope of fourth amendment rights, in a prison setting, is illustrat-

ed by a recent case in which the Supreme Court held that a prisoner has no reasonable expectation of privacy in a prison cell, saying:

Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

*Hudson v. Palmer,* 468 U.S. —, —, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393, 402–03 (1984).

■ Along the same line, the Supreme Court has at least intimated that a prisoner also might not have a reasonable expectation of privacy in body cavity searches. It said in *Bell* that,

*assuming for present purposes* that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility ... we nonetheless conclude that these [visual body cavity] searches [in this case] do not violate that Amendment.

441 U.S. at 558, 99 S.Ct. at 1884, 60 L.Ed.2d at 481 (emphasis added) (citations omitted). We need not attempt to answer that question here, because we conclude the attempted search was reasonable in any event.

Williams argues that, because he was held in virtual seclusion, any body cavity search would be per se unreasonable. He points to the fact he had been held alone in his cell prior to the attempted search and that he normally exercised only under the supervision of prison guards, with no other inmates present. The record, unfortunately, is silent as to what access other prisoners have to the exercise area, but we pre-

sume it was an area accessible to other inmates at other times. While Williams exercised, he was watched by tower guards as well as the guards accompanying him.

Williams cites two federal cases to support this argument. One case, *Hodges v. Klein*, 412 F.Supp. 896 (N.J.1976), held that body cavity searches were justified when an inmate entered or left a prison, and before and after contact visits, but not as a routine procedure. Under the search policy involved in the *Hodges* case, however, forcible rectal examinations upon an inmate's refusal were part of the prison procedures. *Id.* at 898. At least to that extent, the facts of *Hodges* are distinguishable from the present case, where the rules do not permit forcible examinations in the absence of some evidence of actual concealment.

The second case relied upon by Williams is *Hurley v. Ward*, 584 F.2d 609 (2d Cir. 1978), which held that strip searches of a segregated inmate were unconstitutional. In that case, the inmate had been confined to his cell for at least twenty-three hours a day. The court held that the opportunity for transportation of contraband was negligible and that requiring a strip search every time the inmate left his cell was unconstitutional. *Id.* at 611.

It should be noted that both *Hodges* and *Hurley* predated *Bell*. In other federal cases, which postdate *Bell*, such random searches have been approved. For example, in *Bono v. Saxbe*, 527 F.Supp. 1182 (S.D.Ill.1980), the court upheld a body cavity search procedure before and after visits, even though they were noncontact visits. The court acknowledged that such searches "may invade personal privacy and may be a humiliating experience for the inmate," but weighed that consideration against the need for prison security. *Id.* at 1184–85. The court in *Bono* noted that, despite the fact the visits were noncontact, contraband could be hidden in one of the visitation booths by one prisoner, then retrieved by another. *Id.* at 1185–86.

In *Arruda v. Fair*, 710 F.2d 886 (1st Cir.), *cert. denied*, 464 U.S. 999, 104 S.Ct.

502, 78 L.Ed.2d 693 (1983), the first circuit upheld strip searches despite the fact the prisoner there, an inmate in a maximum security unit, had little or no contact with others outside the presence of a guard. The court in *Arruda* said that the fact the inmate was a resident of a maximum security unit, itself, suggested that he posed the greatest risks to security and to other inmates. *Id.* at 887. *See also Daughtery v. Harris*, 476 F.2d 292, 294 (10th Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 112 and 113, 38 L.Ed.2d 91 (1973) (strip search and rectal examination prior to court appearance approved).

We do not believe the apparent lack of opportunity to conceal contraband will necessarily render a random body cavity search unconstitutional. As one federal court has said, "[t]o hold that known cause comparable to that required for a search warrant in private life must precede such a search would be completely unrealistic. It is usually the totally unexpected that disrupts prison security." *Daughtery*, 476 F.2d at 294–95. The Supreme Court in *Bell* approved a body cavity search, even though there had been only one known incident of concealed contraband. It said:

> That there has been only one instance where an ... inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.

441 U.S. at 559, 99 S.Ct. at 1885, 60 L.Ed.2d at 481–82.

Prison officials must be given considerable discretion in determining the need for such body cavity searches. *Id.* at 547, 99 S.Ct. at 1878, 60 L.Ed.2d at 474; *Rogers v. Scurr*, 676 F.2d 1211, 1215 (8th Cir.1982).

We believe the foreseeability of concealment is only one factor to be considered in relation to the overall balancing test of *Bell* and, standing alone, an apparent unlikelihood of concealment will not necessar-

ily void the search. Under *Bell*, the following criteria will decide that issue: (1) The scope of the intrusion and the manner in which it is conducted, and (2) the justification for it. *See* 441 U.S. at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481.

■ As to the first question, the record here shows the attempted search was visual only. There was no touching or probing of the prisoner, a factor which bears on the reasonableness of the search. *See Bono*, 527 F.Supp. at 1185. In fact, the strip search policy provided that an actual intrusion into a body cavity could be made only by a physician or a physician's assistant, and then only if the officers had reasonable grounds to believe the inmate was concealing contraband.

In regard to the humiliation which Williams claims the body cavity search engendered, it should be noted that he had no objection to any of the other strip search procedures under the policy. These procedures required him to stand naked for examination, "from head to toe," to present his hair, mouth, and armpits for visual examination, and to lift his genitals for a visual inspection of his crotch. It would seem that, in view of the arguably dehumanizing nature of these procedures, any extension of the strip search to also require him to allow a visual examination of his rectal area would be only a slight additional intrusion on his dignity.

Williams testified that he had been subjected to the squat and cough procedure on other occasions and had no objection to it this time. The bend and spread procedure, to which he did object, had not been used previously, although he had been in the penitentiary for three and one-half years. Under these facts, it could hardly be claimed that this procedure had been used excessively or capriciously.

■ As to the second prong of the *Bell* test, the need for the search, the Supreme Court said:

[W]e have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

441 U.S. at 547, 99 S.Ct. at 1878, 60 L.Ed.2d at 473.

Williams' argument on the question of the need for the search is similar to his argument under the reasonableness test. Because of his segregated status and the close supervision of prison guards, he argues there was no justification for the search.

We believe the prison officials were within the proper scope of their discretion in concluding that the body cavity search was justified, even in view of Williams' limited access to other persons. The strip search policy, and its stated objectives, set out above, attest to the importance placed by prison officials on such procedures. Other cases have established the extensive potential of body cavities for importation and transportation of contraband. *See, e.g., Bell*, 441 U.S. at 559, 99 S.Ct. at 1884–85, 60 L.Ed.2d at 481; *Daughtery*, 476 F.2d at 294.

Moreover, we do not believe that the concealment or transfer of contraband under Williams' circumstances was totally unforeseeable. For example, it is possible that contraband could be left in the exercise area by one inmate to be picked up by another. *See, e.g., Bono*, 527 F.Supp. at 1185–86. Also, the fact that Williams was in the custody of guards throughout his exercise period does not necessarily prevent the transfer of contraband. Without suggesting there is any evidence of it in this record, it has been noted that prison employees themselves might participate in the concealment and transfer of contraband. *See Arruda*, 710 F.2d at 888. The prison would be justified in considering that possibility in requiring searches of all inmates, even those under close supervision.

■ We conclude the prison officials acted within their discretion and that the body cavity search involved was not an

infringement of Williams' fourth amendment rights. Accordingly, we affirm.

AFFIRMED.